UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID M. GOVERNO AND GOVERNO )
LAW FIRM LLC,                 )
    Plaintiffs             )
                             )
       v.            )  C.A. No. 17-11672-MLW
                             )
ALLIED WORLD INSURANCE        )
COMPANY,                      )
    Defendant.             )

## MEMORANDUM AND ORDER

WOLF, D.J.                                    September 28, 2018

## I.   INTRODUCTION

This insurance coverage dispute arises from the Governo Law Firm's ("GLF") lawsuit against several former GLF attorneys and a competing law firm those attorneys established (the "Underlying Lawsuit"). Faced with counterclaims in its suit against its former attorneys and their new firm, GLF filed this action against its professional insurance provider, Allied World Insurance Company ("Allied World"), to cover the costs of defense. GLF and Allied World now dispute whether the counterclaims are covered by the GLF's Allied World insurance policy (the "Policy").

The defendant has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) (the "Motion to Dismiss"). The defendant asserts that the counterclaim does not allege a claim that falls under the policy's coverage and that certain policy exclusionary provisions would preclude coverage in any event.

For the reasons explained in this Memorandum, the Motion to Dismiss is being denied.

II.  FACTUAL BACKGROUND

GLF specializes in asbestos and toxic tort litigation. GLF was founded by its current Managing Partner, David M. Governo, in 2001. In the summer of 2016, a group of partners of GLF attempted to purchase GLF and its assets from Governo. Governo refused that request. This group of partners (the "departing attorneys") then left GLF to start a competing firm, CMBG3 Law LLC ("CMBG3"). According to GLF, the departing attorneys unlawfully took with them certain GLF proprietary databases, in addition to GLF firm data, laptops, and iPads. GLF maintains that the departing attorneys took this material to use in setting up CMBG3.

After unsuccessfully demanding the return of the property, GLF filed the Underlying Lawsuit in the Suffolk County Superior Court. See Verified Complaint and Jury Demand, Governo Law Firm LLC v. CMBG3 Law LLC, et al., in Complaint, Ex. 2 (Docket No. 1-4, at 14-41) (Underlying Lawsuit Complaint). GLF named as defendants CMBG3, as well as the departing attorneys, Jeniffer A.P Carson, Bryna Rosen Misiura, Kendra Ann Bergeron, David A. Goldman, Brendan J. Gaughan, and John P. Gardella. GLF alleges conversion, misappropriation of trade secrets, breach of loyalty, tortious interference with contractual and advantageous relations, civil conspiracy, and unfair and deceptive trade practices.

2

In response to the complaint, the departing attorneys and CMBG3 asserted a counterclaim against GLF and a third-party complaint against Governo individually. See Counterclaim and Third-Party Complaint in Underlying Lawsuit, in Complaint, Ex. 1 (Docket No. 1-3, 17-31) (Counterclaim and Third-Party Complaint). There are three Counts in the counterclaim: (1) a request for declaratory judgment, regarding the data, information, and materials allegedly taken by the departing attorneys; (2) a claim that GLF and Governo intentionally interfered with the departing attorneys' and CMBG3's contractual and/or advantageous business relationships with clients when GLF refused to reasonably cooperate concerning notification to clients as the departing attorneys were establishing their new law firm, provided unfair notice to clients of the departure, and failed to transfer and release full client file materials; and (3) an ERISA violation based on GLF's alleged failure to provide the departing attorneys benefits owed, and excluding them from management and information during their employment, in particular regarding the firm's defined benefit plan.[1] See Counterclaim and Third Party Complaint, ¶¶74-94.

---

[1] In its Reply, the defendant states that that Count III Counterclaim concerning the ERISA violation was dismissed by the plaintiffs on May 2, 2017, before the case was removed to this

GLF and Governo filed this case against Allied World for the costs of defense. The insurance policy at issue in this case is an LPL Assure Lawyers Professional Liability Insurance Policy. See LPL Assure Lawyers Professional Liability Insurance Policy, in Complaint, Ex. 2 (Docket No. 1-4, at 74-106) (the "Allied World-GLF Policy"). GLF is designated as the Named Insured, and the Policy's effective period was from March 15, 2016 to March 15, 2017. The Policy is written on a "claims made" basis. As stated in the Insuring Agreement, Allied World has "the right and duty to defend any Claim seeking Damages that are covered by this Policy and made against the Insured . . . ." See Allied World-GLF Policy, Section I. The Insuring Agreement further states, in relevant part:

> The Insurer will pay on behalf of an Insured
> . . . all amounts in excess of the Retention
> shown in the Declarations, that an Insured
> becomes legally obligated to pay as Damages
> and Claim Expenses because of a Claim arising
> out any of the following Wrongful Acts by an
> Insured first made during the Policy Period or
> any Extended Reporting Period:
>
> A. Legal Services Wrongful Act
> B. Privacy Wrongful Act
> C. Network Security Wrongful Act

---

Court. See Def's Reply Mem. in Supp. of its Mot. to Dismiss at 1, n.1 (Docket No. 18) (Def.'s Reply). However, Count III is addressed by both parties in their submissions. Therefore, the court considers its implications in this Memorandum. However, because the court has decided that GLF is covered under the Policy despite an exclusionary provision relevant only to Count III, whether Count III has been dismissed does not affect the decision on this Motion to Dismiss.

See Id. The Policy's definition of the relevant terms in the Insuring Agreement are discussed in detail below.

III. PROCEDURAL HISTORY

Governo and GLF filed this case against Allied World Insurance Company in the Superior Court for Middlesex County, Massachusetts. See Complaint, Ex. 2 (Docket No. 1-4, at 4-13) (Pl.'s Compl.). According to the complaint, Allied World must provide defense coverage to GLF because the Counterclaim and Third-Party Complaint contain "Claim[s] seeking Damages that are covered by this Policy and made against an Insured." Id. at ¶15. GLF asserts that Allied World wrongfully refused to provide such defense upon demand. See Id. at ¶¶26, 34, & 38. The complaint alleges causes of action for: (1) a Declaratory Judgment regarding Allied World's obligations under the Policy; and (2) Breach of Contract under the Policy for damages. Id. at ¶¶32-40. Allied World timely removed the case to this Court. See Notice of Removal (Docket No. 1).

Allied World filed the Motion to Dismiss for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6). The defendant asserts four grounds for dismissal: (1) coverage under the policy is unavailable because the policy only covers "Wrongful Acts," including "Legal Services Wrongful Acts," and the acts involved in the Underlying Lawsuit do not qualify as "Legal Services;" (2) coverage is precluded by Exclusion A(2), which excludes from coverage claims "brought by or on behalf of,

5

or in the name or right of, any Insured," arguing that the departing attorneys are within the definition of "Insured"; (3) coverage for Count III is precluded by Exclusion (A)(3), which excludes claims for violations of ERISA; (4) coverage for the Declaratory Judgment Count (Count I) is excluded because the Policy's definition of "Claim" excepts declaratory judgments from coverage.

Plaintiffs filed an Opposition to the Motion to Dismiss. Allied World filed a Reply, and the plaintiffs filed a Sur-reply.

IV. DISCUSSION

1. Legal Standards

a. The Motion to Dismiss Standard

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. This pleading standard does not require "detailed factual allegations," but does require "more than labels and

conclusions." Twombly, 550 U.S. at 55. Therefore, in deciding a motion to dismiss, the court may disregard "bald assertions, unsupportable conclusions, and opprobrious epithets." In re Citigroup, Inc., 535 F.3d 45, 52 (1st Cir. 2008). It must, however, accept well-pleaded allegations as true and draw all reasonable inferences in plaintiff's favor. See Penalbert-Roia v. Fortuno-Burset, 631 F.3d 592, 594-95 (1st Cir. 2011). Moreover, the court may consider "documents that are part of or incorporated in the complaint." Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009).

### b. Insurance Coverage in Massachusetts

Under Massachusetts law, the insured individual or entity has the burden to establish coverage under the insurance policy and the insurer has the burden of demonstrating exclusions from coverage. See Utica Mut. Ins. Co. v. Herbert H. Landy Ins. Agency, Inc., 820 F.3d 36, 41 (1st Cir. 2016). The initial burden on the insured does not require showing with certainty that the claim against the insured falls under the policy's coverage. Rather, an insurer's obligation to defend a claim is triggered when the allegations in the complaint are "reasonably susceptible" to an "interpretation that states or roughly sketches a claim that is covered by the policy's terms." See Billings v. Commerce Ins. Co., 458 Mass. 194, 200-201 (2010); see also Metro. Prop. & Cas. Ins. Co. v. Morrison, 951 N.E.2d 662, 667 (Mass. 2011) (cited in Utica

Mut. Ins., 820 F.3d at 41). Amplifying this principle, the Massachusetts Supreme Judicial Court wrote:

> The duty to defend is determined based on the facts alleged in the complaint, and on facts known or readily knowable by the insurer that may aid in its interpretation of the allegations in the complaint. In order for the duty of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage.

Billings, 458 Mass. at 200 (citations and quotations omitted); see also Philadelphia Indem. Ins. Co. v. Consigli Constr. Co., Inc., 2017 WL 1080904, at *3 (2017) (Wolf, J.) ("[I]n Billings the Supreme Judicial Court confirmed that the duty to defend exists if the allegations of the complaint create a reasonable possibility that coverage exists for a particular claim.").

In interpreting and applying insurance policy provisions, courts in Massachusetts apply the principles applicable to other contracts. As explained by the First Circuit in Utica Mutual Insurance:

> [W]e must construe the words of the policy in their usual and ordinary sense. Every word must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable. If in doubt, we consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered. When confronting ambiguous language, we construe the policy in

> favor of the insured and against the drafter,
> who is invariably the insurer, unless specific
> policy language is controlled by statute or
> prescribed by another authority.

820 F.3d at 42 (quoting Metro. Prop. & Cas. Ins., 951 N.E.2d at
667); see also Cont'l Gas. Co. v. Gilbane Bldg. Co., 461 N.E.2d
209, 212 (Mass. 1984). An insurance policy provision is considered
ambiguous only if "it is susceptible of more than one meaning and
reasonably intelligent persons would differ as to which meaning is
the proper one." Certain Interested Underwriters at Lloyd's,
London v. Stolberg, 680 F.3d 61, 66 (1st Cir. 2012) (internal
quotations and citations omitted); see also Strange v. Genesis
Ins. Co., 536 F. Supp. 2d 71, 74 (D. Mass. 2008).

   With respect to exclusionary provisions in particular, the
First Circuit has stated that the general rule that ambiguous
language should be construed against the insurer "applies with
particular force." Utica Mut. Ins., 820 F.3d at 42. Massachusetts
courts have similarly held that "[e]xclusions from coverage are to
be strictly construed" and "[a]ny ambiguity in the somewhat
complicated exclusions must be construed against the insurer." See
Sterilite Corp. v. Cont'l Cas. Co., 17 Mass. App. Ct. 316, 321
n.10 (1983).

   2.   Coverage Under the Allied World-GLF Policy

   The court finds that the counterclaim in this case is
"reasonably susceptible" to an interpretation that states a claim

covered by the Policy. As indicated earlier, in describing the scope of coverage, the Policy covers costs that the "Insured becomes legally obligated to pay as Damages and Claim Expenses because of a Claim arising out of . . . [a] Legal Services Wrongful act." See Allied World-GLF Policy, Sections I & III.Q. The Policy defines a "Legal Services Wrongful Act" as "any actual or alleged act, error or omission committed by an Insured, solely in the performance of or failure to perform Legal Services." Allied World-GLF Policy, Section III.Q. "Legal Services" is defined, in relevant part, as those "services performed on behalf of the Named Insured for others by an Insured, . . . but only where such services were performed in the ordinary course of the Insured's activities as a lawyer." See Id. at Section III.P.

The definition of "Legal Services" under the Policy is similar to the definition of professional act or services under Massachusetts law. For the purposes of professional liability insurance policies in Massachusetts, a professional act or service is defined as:

> one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. In determining whether a particular act is of a professional nature or a professional service we must look not to the title or character of the party performing the act, but to the act itself.

Roe v. Fed. Ins. Co., 412 Mass. 43, 48 (1992) (quotations and citations omitted) (emphasis added).

Therefore, the court must determine whether the acts or services alleged in the counterclaim are part of the ordinary course of a lawyer's business or otherwise arise out of a lawyer's specialized knowledge or skill. The conduct alleged in the counterclaim is of two types. First, the departing attorneys allege that GLF withheld payment of wages and benefits, and also did not disclose the existence of a benefit plan even though the departing attorneys were likely eligible to participate in that plan. See Counterclaim and Third Party Complaint, ¶¶6-49. The second set of activities consists of GLF's alleged refusal to release client file materials and property of transferred clients when those clients followed the departing attorneys to CMBG3 Law. Id. ¶¶50-72. The alleged acts concerning wages and benefits are not "reasonably susceptible" to an interpretation that triggers Policy coverage because they are properly characterized as business decisions, and with regard to benefits, are subject to the exclusions for ERISA matters. See Reliance Nat'l Ins. Co. v. Sears, Roebuck and Co., 58 Mass. App. Ct. 645, 647-49 (2003) (holding that the billing function of a lawyer was not a "professional service"). However, the court finds that the alleged conduct

concerning client matters is susceptible to an interpretation that triggers coverage.

More specifically, it is reasonably possible that the allegations in the counterclaim state a claim within the Policy's coverage for "Legal Services Wrongful Acts" because the duties to properly notify clients regarding an attorney's departure and transfer client files implicate the specialized knowledge and skill of lawyers. The professional rules and ethical duties associated with an attorney's obligations to former clients and the termination of client representation attest to how these activities involve understandings and intellectual proficiencies unique to the legal profession. See Mass R. Prof. C. 1.9 ("Duties to Former Clients"); Rule 1.16 ("Declining or Terminating Representation"). For example, Rule 1.16(e) of the Massachusetts Rules of Professional Conduct defines what constitutes a "client file," describing the nature of client property that must be returned upon the termination of legal representation. This duty, which is designed to protect a lawyer's client, is specific to the legal profession. In addition, in some instances, it is likely that a lawyers' professional knowledge and expertise would be required to determine properly what client materials must be released. Indeed, the counterclaim itself asserts that GLF was obligated to transfer "other information and data necessary and required for the purpose of ongoing legal representation." See

Counterclaim and Third Party Complaint, at ¶¶58 & 65. It is more than possible that discerning the particular information and data "necessary" "for the purpose of ongoing legal representation" involves a legal assessment by a lawyer, or at least specialized knowledge held by those who practice law.

Similarly, the act of notifying clients regarding the departure of attorneys from the firm requires conduct and skill particular to the legal profession. The Supreme Judicial Court recognized in Meehan v. Shaughnessy that notifying a law firm's client of the departure of attorneys from the firm implicates an "ethical standard . . . that any notice [must] explain to a client that he or she has the right to decide who will continue the representation." See 404 Mass. 419, 437 (1989). In describing the standard, the Supreme Judicial Court cited American Bar Association guidance regarding attorney ethics and professional responsibility. Id. Proper and timely notification of clients upon the departure of attorneys from a law firm may, therefore, properly be considered a professional act unique to the legal profession.[2]

---

[2] In its Reply, the defendant discusses Crum and Forster Managers Corp. v. Resolution Trust Corp., 156 Ill. 2d 384 (1993). In that case, the Illinois Supreme Court held that former employees of a real estate firm taking confidential sales techniques from the firm did not arise out of real estate "professional services," for insurance coverage purposes. See 156 Ill. 2d at 394-95. However, the alleged taking in that case did not implicate duties particular to the real estate profession, at least to the same extent as do

In its Motion to Dismiss and Reply, the defendant characterizes the allegations underlying the counterclaim as business decisions or ministerial activities not involving the specialized legal skill or knowledge. "[P]rofessional liability policies generally do not cover . . . business management activities, business decisions of a nonprofessional nature, activities not requiring professional expertise, or activities totally unrelated to the profession." Utica Mut. Ins., 820 F.3d at 42; see also Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co., 489 F.3d 71, 74 (1st Cir. 2007) (holding that activities that may "set the stage" to perform professional services do not themselves constitute professional services). In particular, the defendant relies on Clermont v. Continental Casualty Co., 778 F. Supp. 2d 133 (D. Mass. 2011), a case which also concerned a law firm's claims against a departing attorney for issues caused by the departure, in order to contend that client notification and client property retention issues should be characterized as business operation issues for insurance purposes.

However, the defendant's reliance on Clermont is unpersuasive. Although in Clermont the court acknowledged that the plaintiffs sought insurance protection for three distinct claims

———————————

client transition and attorney departure issues in the legal profession.

(pirating cases, failing to apprise the law firm of the status of his work, and settling cases without paying any portion of the fee to the firm), the court determined that the relief sought was "at its core" for the alleged violation of the fee sharing arrangement "which is part of the billing function of a lawyer . . . not a professional service." Clermont, 778 F. Supp. 2d at 140-41. In contrast, the allegations against GLF are not properly characterized as business-like "at [their] core." While the departing attorneys' allegations concerning wages and benefits counts may properly be characterized as involving business decisions, the allegations regarding refusal to transfer client property and improper client notification concern distinct facts and are of equal weight. Indeed, Count II incorporates both sets of allegations, focusing especially on the allegations concerning the notification of and interference with clients who chose to transfer legal matters to the departing attorneys.[3] See Counterclaim and Third Party Complaint, ¶¶80-82; Cf. UTICA Mut. Ins. Co., No. 1:13-CV-11471-IT, 2014 WL 5475038, at *4 (D. Mass.), aff'd, 820 F.3d 36 (1st Cir. 2016) (identifying a claim as

---

[3] In Count II in the "Causes of Action" section of the counterclaim, the counterclaim reiterates the allegations regarding unfair notice, failure to cooperate on notification, and delay file transfer, but does not do so for the benefit and wage issues. See Counterclaim and Third Party Complaint, at ¶¶81, 82.

sufficient for coverage purposes because it was an "independent cause of action" from a claim that was insufficient); Massamont, 489 F.3d at 73 (evaluating the structure of the complaint to discern the "gravamen" of the claim). Furthermore, the Clermont court did not address the ethical obligations unique to the legal profession that are implicated here.

The court recognizes that GLF's management of the termination and transition of client relationships has a business component. However, this does not preclude coverage. In Utica Mutual Insurance, the First Circuit acknowledged that the activities out of which allegedly covered claim arose may have qualified as both professional services and improper business practices, holding that they were nevertheless covered under the insurance policy. See 820 F.3d at 44. As the First Circuit observed, "some professional decisions also affect business practices," such that "these two categories [are not] mutually exclusive." See Id.[4]

---

[4] Allied World further asserts that because the Policy states that the act be committed "solely" in the performance or failure to perform Legal Services, coverage would not be triggered even if specialized professional knowledge were required to some degree. However, this contention fails to recognize that the defendant's obligation to provide coverage is triggered by the "possibility" that the claim falls within the Policy. See Billings, 458 Mass. at 200. The conduct of GLF and Governo could reasonably be interpreted as "solely" legal services for coverage purposes.

Moreover, it is significant that the Policy in this case uses the term "arising out . . . of" to define the relationship between a covered claim and the "Legal Services Wrongful Act." In Medical Records Associates v. American Empire Surplus Lines Insurance Company, the First Circuit discussed the difference between policies that cover harms that "aris[e] out of" acts or omissions in the rendering of professional services, as opposed to those that occur "by reason of" acts or omissions. See 142 F.3d 512, 516, n.4 (1st Cir. 1998). As the First Circuit wrote, [t]he latter [by reason of language] arguably requires a determination that the harm alleged was due to the manner in which professional services were provided; the former [arising out of language] appears to require only a connection between the challenged conduct and the insured's provision of professional services." Id.; see also Utica Mut. Ins., 820 F.3d at 44 ("The phrase 'arising out of' must be read expansively, and suggests 'but for' causation."). In effect, "arising out of" creates a lower burden for the insured seeking to demonstrate that a claim is covered.

Here, GLF's allegedly improper client notification and delay in transferring of client files may qualify as harms "due to the manner in which [legal] services were provided." In any event, they are reasonably interpreted as being connected, and causally related, to the provision of legal services. Proper client notification of attorney departure and release of client files are

essential to a law firm's maintenance of client relationships, and they play an important role in a law firm's compliance with its professional and ethical responsibilities. As explained earlier, in some instances, they could require a lawyer's professional legal judgment to perform. Therefore, contrary to the defendant's assertion, these activities are not mere "forerunners" to the provision of legal services, but rather qualify as "Legal Services" for Policy purposes.

### 3.   The Policy Coverage Exclusions

The defendant asserts that even if this court were to find that the counterclaim arose out of the provision of legal services, various exclusionary provisions contained in the Policy apply. However, the defendant's contention regarding how coverage is precluded by the exclusions is incorrect.

### a.   The Declaratory Judgment and ERISA Exclusions

According to the defendant, Counts I and III of the Counterclaim and Third Party Complaint are precluded due to exclusions in the Policy for declaratory judgment and ERISA claims. Although the defendant is correct that the ERISA and Declaratory Judgment claims are not independently covered by the Policy due to the exclusions, Allied World nevertheless has an obligation to provide defense for them in this case.

Massachusetts recognizes the "complete defense" rule for insurance policy coverage. Under this rule, so long as an insurance

18

policy covers one count alleged against the insured, the insurer is obligated to defend on all counts of the complaint, even if the other counts would not be independently covered. See GMAC Mortg., LLC v. First Am. Title Ins. Co., 464 Mass. 733, 738-39 (2013); Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 260 F.3d 54, 63 (1st Cir. 2001). Accordingly, GLF need only establish that one of the claims alleged in the counterclaim triggers coverage for this court to find that Allied World is obligated to defend.

Count III of the Counterclaim, concerning a violation or ERISA, is precluded by Exclusion A(3) of the Policy, which provides that the Policy does not cover any claim "for any actual or alleged violation by an Insured of the Employment Retirement Income Security Act of 1974 . . . ." See Allied World-GLF Policy, at Section IV.A.3. Similarly, Count I of the counterclaim does not fall under the Policy because the Policy's definition of Claim "does not include . . . any proceeding that seeks injunctive, declaratory, equitable or non-pecuniary relief or remedies of any type." See Id. at Section III.C. Plaintiffs do not contest the applicability of these provisions. However, as explained earlier, plaintiffs have demonstrated for present purposes that Count II of the counterclaim is subject to an interpretation that triggers Policy coverage. Accordingly, the application of the ERISA and declaratory judgment exclusions is not material to whether there is a duty to defend in this case.

19

### b. Exclusion A(2): Claims Between "Insureds"

In its Motion to Dismiss, the defendant relies on two exclusionary provisions that, if applicable, would preclude coverage of all Counts in the counterclaim, even if the court holds that one of the counterclaims involve the performance of legal services. First, Exclusion A(2) precludes coverage for any Claim:

> brought by or on behalf of, or in the name or right of, any Insured; provided, however, that this Exclusion A.2 shall not apply to any Claim which arises out of Legal Services rendered by one Insured to another where an attorney-client relationship exists between such Insureds.

See Id. at Section IV.A.2 (emphasis added).

In relevant part, the term "Insured" under the Policy is defined in Section III.N of the Policy as:

> 3. any lawyer or professional corporation listed in the Application, on the day the Policy Period incepts until such time as the lawyer or professional corporation ceases to be a member of the Named Insured subject to paragraph 5. below, but only in the performance of or failure to perform Legal Services on behalf of the Named Insured; . . .
>
> 5. any lawyer or professional corporation who is a former partner, officer, director, stockholder or shareholder or employee of the Named Insured or Predecessor Firm but only in the performance of or failure to perform Legal Services on behalf of the Named Insured or Predecessor Firm;

See Id. at Section III.N.

The defendant focuses on sub-section 5, asserting that because departing attorneys qualify as "former partners" of GLF,

20

they are defined as "Insured," and accordingly a claim by a departing attorney against the Named Insured is not covered by the Policy. The plaintiffs, however, focus on sub-section 3's language that excludes from the definition of Insured those lawyers who have "cease[d] to be a member of the Named Insured." According to the plaintiffs, because the purported Legal Services Wrongful Acts occurred after the attorneys' departure, those individuals fall under the "cease[d] to be a member" provisions.

The court finds that the departing attorneys are not "Insureds" under sub-section 3 or 5. In sub-section 5, a former partner or employee is only an "Insured" regarding "the performance or failure to perform Legal Services <u>on behalf of the firm</u>." Therefore, for the purpose of sub-section 5, a former partner or employee of the law firm is an "Insured" only if he or she is sued for acts or omission that allegedly occurred while he or she was at the firm. The departing attorneys are not "Insureds" for the purpose of this case because they are being sued primarily, if not exclusively, for actions taken after they have left GLF. Nor are the departing attorneys "Insureds" as defined in sub-section 3, which provides that coverage for their conduct ended when they left the firm and "cease[d] to be members of the Named Insured." Moreover, the departing partners have not be sued for alleged conduct "on behalf of the firm," GLF. This too takes them out of the definition of "Insured" in sub-sections 3 and 5. Therefore,

the departing attorneys are not "Insureds," and the Underlying Lawsuit is not a case between two "Insureds."[5]

4.   Exclusion B(8): Conversion and Misappropriation

Exclusion B(8) of the Policy excludes from coverage claims for "the loss of value of any asset in the Insured's care, custody, or control, misappropriation, conversion, embezzlement . . . ." Id. at Section IV.B.8 (emphasis added). Although Allied World did not mention this Exclusion in the Motion to Dismiss, it does so in its Reply. See Def.'s Reply, at 4-5. More specifically, the defendant contends that GLF's retention of client files and its decision not to provide them to the departing attorneys constitutes conversion and misappropriation, and, therefore, coverage is precluded.

The court finds that the allegations in the counterclaim are not reasonably interpreted as triggering Exclusion B(8). See

---

[5] Moreover, there is one defendant in the Underlying Lawsuit that under no interpretation of the Policy's definition of "Insured" qualifies as an "Insured." Specifically, the law firm formed by the departing attorneys, CMBG3, is not a former or current partner, officer, director, stockholder, shareholder or employee of GLF. See Allied World-GLF Policy, at Section III.N. At this stage in the case it is not necessary to decide whether the fact that one party in the underlying litigation, a counterclaim plaintiff, is not an "Insured" is sufficient to remove the counterclaim out of the exclusionary provision. Nevertheless, the court finds that view at least plausible. For this reason as well, the motion to dismiss due to Exclusion A(2) is being denied.

Cont'l Cas. Co., 391 Mass. at 150 ("[O]ur function simply is to decide whether [the] allegations are reasonably susceptible of the interpretation that [states a claim under the policy] and of a type not within the . . . [policy's] exclusion[s].") (emphasis added) (citations and quotations omitted). Notably, unlike the underlying claim against the departing attorneys, neither conversion nor misappropriation are alleged in their counterclaim.[6] Instead, as explained earlier, the counterclaim focuses on issues of professional responsibility, and interference with contractual or business relationships. Furthermore, the defendant cites no case that characterizes the retention of client information as either conversion or misappropriation, and the defendant does not explain how the elements of those crimes are satisfied in this case. For example, no argument is provided to prove that GLC retained the property for "[its] own use," as required by the defendant's cited definition of misappropriation. See Def.'s Reply, at 5. Therefore, the plaintiffs' claim that Exclusion B(8) does not preclude coverage in this case is more than plausible.

---

[6] The counterclaim differs from the underlying complaint in this regard. As noted earlier, GLF's complaint against the departing attorneys did assert a claim of conversion, as well as misappropriation of trade secrets. See Underlying Lawsuit Complaint, ¶¶88-101.

V.   ORDER

For the foregoing reasons, it is hereby ORDERED that:

1.   Defendant's Motion to Dismiss the Complaint (Docket No. 10) is DENIED.

2.   As the court has not found a hearing to be necessary, Defendant's Motion for Hearing regarding the Motion to Dismiss (Docket No. 23) is DENIED.

3.   This case is REFERRED to the Magistrate Judge for pretrial purposes.

UNITED STATES DISTRICT JUDGE